**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUN 21 2017

ARTHUR JOHNSTON
BY_____ DEPUTY

BAPTIST MEMORIAL HOSPITAL-GOLDEN
TRIANGLE, INC., CALHOUN HEALTH
SERVICES, DELTA REGIONAL MEDICAL
CENTER, GRENADA LAKE MEDICAL CENTER,
MERIT HEALTH BATESVILLE, FORMERLY TRI-
LAKES MEDICAL CENTER, MISSISSIPPI
BAPTIST MEDICAL CENTER, INC., ST.
DOMINIC-JACKSON MEMORIAL HOSPITAL,
TISHOMINGO HEALTH SERVICES, INC.    )
                                     )
                                     )
            Plaintiffs,              )
                                     )
    v.                               )    Civil Action No. 3:17cv491 TSL-
                                     )                          LRA
                                     )
THOMAS E. PRICE, in his              )
official capacity as Secretary of the United )
States Department of Health and Human )
Services,                            )
                                     )
SEEMA VERMA, in her                  )
official capacity as Administrator,  )
Centers for Medicare & Medicaid Services, )
                                     )
AND                                  )
                                     )
CENTERS FOR MEDICARE & MEDICAID      )
SERVICES.                            )
                                     )
            Defendants.              )

## COMPLAINT

COME NOW Plaintiffs Baptist Memorial Hospital-Golden Triangle (BMH-GT); Calhoun

Health Services (Calhoun); Delta Regional Medical Center (DRMC); Grenada Lake Medical Center

(GLMC); Alliance Health Partners, LLC, d/b/a Merit Health Batesville, formerly Tri-Lakes Medical

Center (MH-Batesville); Mississippi Baptist Medical Center, Inc. (MBMC); St. Dominic-Jackson

Memorial Hospital (St. Dominic); and Tishomingo Health Services, Inc. (THS) (referred to

collectively herein as "Plaintiffs" or "Plaintiff Hospitals"), through counsel, and file this action for declaratory and injunctive relief against defendants, Thomas E. Price, in his official capacity as Secretary of the United States Department of Health and Human Services, Seema Verma, in her official capacity as Administrator, Center for Medicare and Medicaid Services, and Centers for Medicare and Medicaid Services (CMS) for violations of the Medicaid Act and the Administrative Procedures Act (APA). In support thereof the plaintiffs state as follows:

## I. **INTRODUCTION**

1.      At all pertinent times, Plaintiff Hospitals were each licensed Mississippi hospitals participating in the Mississippi Medicaid Program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (the "Medicaid Statute").  As such, Plaintiff Hospitals treated a significant number of uninsured patients for which they receive no payment, as well as a high volume of patients who receive benefits from the Medicaid program. Medicaid typically provides for lower levels of reimbursement than other forms of coverage, often at levels significantly below hospital costs.  As a result, the Plaintiff Hospitals shoulder a disproportionately high uncompensated care burden.

2.      At all pertinent times, each Plaintiff Hospital has been eligible for additional Medicaid payments under the disproportionate share hospital ("DSH") program established by Congress in 1981. DSH payments are an essential funding source for DSH hospitals, such as the Plaintiffs, that serve a disproportionate share of Medicaid and uninsured patients, as DSH funding offsets otherwise uncompensated costs of providing such care.

3.      This lawsuit challenges unlawful policies, in the form of Frequently Asked Questions (FAQs) issued in 2010 by Defendant CMS without notice or warning through a document posted on CMS's website and an amendment to 42 C.F.R. § 447.299 issued as a Final Rule in 2017.  These policies are found in a document entitled "Additional Information on the

2

DSH Reporting and Audit Requirements," https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (last visited March 22, 2017); and at 82 Fed. Reg. 16114 (Apr. 3, 2017). The FAQs and amended regulation purported to merely clarify CMS policy, when in fact they substantively changed the calculation of the "hospital-specific limit" on DSH payments as set by Congress in the Medicaid Statute, CMS's own regulations, and other informal guidance previously issued by CMS.

4.    The federal Medicaid Statute sets forth a methodology for calculating a hospital-specific limit on DSH payments, which includes a Medicaid shortfall component and an uninsured shortfall component. Under the statutory methodology, a hospital's uncompensated care cost (the Medicaid shortfall component of the hospital-specific DSH limit) is determined by subtracting identified Medicaid payments from the cost of providing care to Medicaid beneficiaries. Only Medicaid payments are to be subtracted from the costs of services to individuals eligible for Medicaid. 42 U.S.C. § 1396r-4(g)(1)(A).

5.    Likewise, regulations promulgated by CMS in 2008 ("the 2008 Final Rule"), effective during the time periods relevant to this action, specify that only Medicaid payments are subtracted from Medicaid cost in calculating the Medicaid shortfall component of the hospital-specific DSH limit. 42 C.F.R. § 447.299.

6.    FAQs 33 and 34 (attached as Exhibit 1) add new categories of payments—Medicare and private insurance payments—that must be subtracted from Medicaid costs to determine the hospital-specific DSH limit. The FAQs unlawfully lowered Plaintiff Hospitals' hospital-specific limit on DSH payments in direct conflict with the Medicaid Statute and CMS's own regulations.

7.    In addition to substantively violating the Medicaid Statute and CMS regulations, Defendants failed to comply with the procedural requirements of the Administrative Procedure Act

3

("APA"), issuing the FAQs without required notice and comment rule making.

8.    The policies in FAQs 33 and 34 are unlawful and must be set aside under the APA on several grounds:

> (1)    The policies failed to satisfy the APA's procedural requirements.

> (2)    The policies are not authorized by the Medicaid Statute; and

> (3)    The policies are arbitrary, capricious, and an abuse of discretion.

9.    Federal district courts in other jurisdictions already have enjoined CMS from enforcing one or both of FAQs 33 and 34, either preliminarily or permanently. *See infra* Paragraphs 20-24. Despite these unambiguous federal district court orders, Defendants have continued to apply and enforce the FAQs in all jurisdictions, including Mississippi, except in those specific states in which there have been court orders entered enjoining enforcement.

10.    Facing these unfavorable judicial decisions CMS proposed a rule in August 2016 to codify the policies in FAQs 33 and 34 (the "Proposed Rule"). On April 3, 2017, CMS published a Final Rule, 82 Fed. Reg. 16114 (Apr. 3, 2017), amending CMS regulations to require the inclusion of Medicare and private insurance payments in calculating the hospital-specific DSH limit (the "2017 Final Rule"). The 2017 Final Rule became effective June 2, 2017.

11.    Like the FAQs, the 2017 Final Rule unlawfully lowers the hospital-specific limit on DSH payments in direct conflict with the Medicaid Statute. Thus, the 2017 Final Rule is unlawful and must be set aside under the APA. Alternatively, the 2017 Final Rule can only have prospective, and not retrospective, application.

12.    CMS's unlawful enforcement of the policies in FAQs 33 and 34, which are now reflected in the 2017 Final Rule, have caused each of the respective hospitals to be subjected to recoupment proceedings for repayment of amounts claimed to be in excess of the hospital-specific DSH limit for DSH years 2012 and/or 2013. Recoupment of these sums would deprive Plaintiffs of

a significant portion of the DSH payments to which they are entitled. These funds are needed in order for Plaintiffs to provide the care intended under the Medicaid Act and DSH program.

## II.  JURISDICTION AND VENUE

13.     This action presents a case and controversy under the Medicaid Act, 42 U.S.C. § 1396, *et seq.*, the Administrative Procedure Act, 5 U.S.C. §§ 551-59, 704-06, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201.  This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties under 28 U.S.C. §§ 1331, 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 704-706.

14.     Venue lies in this district under 28 U.S.C. § 1391 in that defendants Price and Verma are officers and employees of a United States agency, the Plaintiffs operate or operated the subject hospital facilities in Mississippi, and no real property is involved in this action. Venue also lies in this district under 5 U.S.C. § 703 because there is no special statutory procedure for appeal, and this court is a court of competent jurisdiction.

## III.  PARTIES

15.     Plaintiff Hospitals consist of both public and private entities that currently operate Medicaid-participating hospitals in Mississippi or did so during the times relevant to this action. Plaintiff BMH-GT is a Mississippi nonprofit corporation that operates a licensed hospital in Columbus, Mississippi. Plaintiff Calhoun Health Services, during the times relevant to this action, was a statutory community hospital owned by Calhoun County, Mississippi that operated a licensed hospital in Calhoun City, Mississippi. Plaintiff Delta Regional Medical Center is a statutory community hospital owned by Washington County, Mississippi, that operates a licensed hospital in Greenville, Mississippi. Plaintiff Grenada Lakes Medical Center, during the times relevant to this action, was a statutory community hospital owned by Grenada County, Mississippi, that operated a licensed hospital in Grenada, Mississippi.  Plaintiff BMH-Batesville is

a Mississippi limited liability company (LLC) and is the legal successor to Tri-Lakes Medical Center which at the times relevant to this action operated a licensed hospital in Batesville, Mississippi. Plaintiff MBMC is a Mississippi nonprofit corporation that operates a licensed hospital in Jackson, Mississippi. Plaintiff St. Dominic is a Mississippi nonprofit corporation that operates a licensed hospital in Jackson, Mississippi. Plaintiff THS is a foreign nonprofit corporation that operates a hospital facility in Tishomingo, Mississippi.

16.    Defendant Thomas E. Price, M.D. is the Secretary of the Department of Health and Human Services (DHHS), which is statutorily responsible for the administration of federal responsibilities under the Medicaid Statute, 42 U.S.C. § 1396, *et seq.* Defendant Price is sued solely in his official capacity.

17.    Defendant Seema Verma is the Administrator of CMS. CMS is the agency within DHHS that administers the Medicaid program and the DSH program. Defendant Verma is sued solely in her official capacity.

18.    Defendant CMS is the federal agency to which Defendant Price has delegated the authority pursuant to the Social Security Act, 42 U.S.C. §§ 1396a(13)(A)(iv), 1396r-4(a)(1)(B), to administer the Medicaid and DSH programs.

## IV. DSH REIMBURSEMENT LITIGATION

19.    Courts in three other jurisdictions have preliminarily or permanently enjoined CMS from enforcing one or both of FAQs 33 and 34. *Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014); *New Hampshire Hospital Ass'n v. Burwell*, No. 15-cv-460, 2017 U.S. Dist. LEXIS 29549 (D.N.H. Mar. 2, 2017); *Tenn. Hosp. Ass'n v. Price*, no. 3:16-cv-03263, doc. 82 (M.D. Tenn. May 30, 2017)

20.    In the first case, two children's hospitals, one in Texas and one in the State of Washington, challenged FAQ 33 in the United States District Court for the District of Columbia.

6

21.    On December 29, 2014, the United States District Court for the District of Columbia (Sullivan, J.) found that plaintiff hospitals "are likely to succeed in arguing that FAQ 33 must be set aside as unlawful," for failure to comply with the APA's notice and comment provisions at 5 U.S.C. § 553. *Texas Children's Hosp.*, 76 F. Supp. 3d at 241.

22.    In the second case, several DSH hospitals and the New Hampshire Hospital Association challenged both FAQs 33 and 34 in the United States District Court for the District of New Hampshire.

23.    On March 2, 2017, the United States District Court for the District of New Hampshire (McCafferty, L.) granted summary judgment in favor of plaintiffs, "permanently enjoin[ing CMS] from enforcing FAQs 33 and 34." *New Hampshire Hospital Ass'n v. Burwell*, No. 15-cv-460, 2017 U.S. Dist. LEXIS 29549, at *43 (D.N.H. Mar. 2, 2017). Similar to *Texas Children's*, the court in New Hampshire found that FAQs 33 and 34 failed to comply with the APA's notice and comment provisions, thereby violating 5 U.S.C. §§ 706(2)(A), (D). The court also found that DHHS and CMS "acted 'in excess of statutory jurisdiction, authority . . . or short of statutory right'" in issuing FAQs 33 and 34. *Id.* at *33 (quoting 5 U.S.C. § 706(2)(C)).

24.    In the third case, the Tennessee Hospital Association and three hospitals sued CMS to enjoin collection of recoupments for fiscal year 2012 resulting from the application of the policies in FAQs 33 and 34. As in the previous two cases, the district court on May 30, 2017, entered a preliminary injunction that "enjoined [Defendants] from imposing or requiring the State of Tennessee to impose DSH recoupment payment requirements on the Plaintiff hospitals for the 2012 DSH audit." *Tenn. Hosp. Ass'n v. Price*, no. 3:16-cv-03263, doc. 82 (M.D. Tenn. May 30, 2017).

25.    Also, in August 2015, the Missouri Department of Social Services filed suit in the District Court in the District of Columbia seeking a declaration that the District Court's order in *Texas Children's* also enjoins CMS from enforcing, implementing, or applying the policy in FAQ

33 in the state of Missouri. *Missouri Dep't of Social Services v. U.S. Dep't of Health and Human Services,* Civ. No. 1:15-cv-01329 (*Missouri Complaint*). That case was stayed in August 2016, pending resolution of the *Texas Children's* case.

## V. STATUTORY AND REGULATORY BACKGROUND

### The Medicaid Program

26.    The Medicaid program is a cooperative state-federal program that provides medical assistance to needy persons. *See* 42 U.S.C. § 1396, *et seq*. Both the federal and state governments jointly fund the Medicaid program.

27.    State participation in the Medicaid program is voluntary, but if a state elects to participate, it must comply with federal requirements. Failure to comply with federal requirements, including Title XIX of the Social Security Act and CMS regulations implemented pursuant thereto, results in a disallowance by CMS and recoupment of federal funding. *See* 42 U.S.C. §§ 1316, 1396b(d)(5).

28.    Each state administers its Medicaid program pursuant to a State Plan for Medical Assistance ("the State Plan"), which must be approved by CMS. *See* 42 U.S.C. § 1396a. Changes to a state's Medicaid program must be submitted in a State Plan Amendment which are also subject to CMS approval. *See id.*; 42 C.F.R. § 430.12.

29.    CMS is the federal agency with responsibility for administering the Medicaid program. CMS often has flexibility to establish Medicaid program parameters. However, in some instances, including with respect to the DSH program, Congress has imposed by statute requirements to which CMS and the states are bound.

### Medicaid Disproportionate Share Hospital Payments

30.    Seeking to ensure that state Medicaid programs provide adequate payments to hospitals that shoulder a disproportionate share of the responsibility for providing care to low-

income Medicaid and uninsured patients, Congress established the Medicaid DSH program in 1981, requiring that states "take into account the situation of hospitals which serve a disproportionate share of low income patients with special needs" when developing hospital payment rates. Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357, 808 (codified at 42 U.S.C. § 1396a(a)(13)). The DSH program was intended to provide financial stability for safety net hospitals that are vital to ensuring and preserving access to care for low income populations.

31.     In 1987, after states had failed to adequately implement the DSH program, Congress passed more stringent DSH requirements, establishing a federal definition of qualifying DSH hospitals and requiring states to provide "for an appropriate increase in the rate or amount of payment for . . . services provided by such hospitals." Omnibus Budget Reconciliation Act of 1987, Pub. L. No. 100-203, 95 Stat. 1330-148 (codified at 42 U.S.C. § 1396r-4). These federally required payments are known as DSH payments.

32.     DSH payments are subject to two limits—state allotments limited in overall growth and hospital-specific DSH limits. The latter, adopted by Congress in 1993, is at issue here.

33.     The Medicaid Statute establishes the formula for calculating the hospital-specific DSH limit. Under the Medicaid Statute, DSH payments to a hospital cannot exceed:

> [T]he costs incurred during the year of furnishing hospital services (as determined by the Secretary and net of payments under this subchapter, other than under this section, and by uninsured patients) by the hospital to individuals who either are eligible for medical assistance under the State plan or have no health insurance (or other source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).

34.     Two categories of "costs" are eligible for DSH reimbursement under the Medicaid Statute: (1) the costs of services to Medicaid patients (the "Medicaid shortfall" component), and (2) the costs of services to uninsured patients (the "uninsured shortfall"

9

component). Only the calculation of the Medicaid shortfall component is at issue here.

35.    The phrase "payments under this subchapter," which must be deducted from "costs," refers to payments received under the Medicaid Statute, codified at Subchapter XIX of Title 42, Chapter 7 of the U.S. Code.  Payments from private insurance and Medicare are not "payments under this subchapter."

36.    The Medicaid Statute is unambiguous in requiring that only Medicaid payments are subtracted from "the costs . . . of furnishing Medicaid services" to calculate the Medicaid shortfall component of the hospital-specific DSH limit.

## DSH Audit and Reporting Requirements

37.    In 2003, Congress established annual DSH auditing and reporting requirements designed in part to ensure the correct calculation of the hospital-specific DSH limit. States must submit to CMS annually an independent certified audit verifying the state's compliance with the DSH program. 42 U.S.C. § 1396r-4(j).

38.    Specifically, the Medicaid Statute requires the auditor to verify that "[o]nly the uncompensated care costs of providing inpatient hospital and outpatient hospital services to individuals described in paragraph (1)(A) of such subsection [42 U.S.C. § 1396r-4(g)(1)(A)] are included in the calculation of the hospital-specific limits under such subsection." 42 U.S.C. § 1396r-4(j)(2).

39.    Any overpayments revealed by a DSH audit "must be recouped by the state within one year of their discovery or the federal government may reduce its future contribution." *Texas Children's Hosp.*, 76 F. Supp. 3d at 230 (citing 42 U.S.C. §1396b(d)(2)(C), (D)).  Alternatively, a state may redistribute excess DSH payments to other DSH hospitals instead of returning the federal share to CMS, provided its approved State Plan reflects its redistribution policy. CMS Informational Bulletin, *Medicaid Disproportionate Share Hospital (DSH) Audit and Report*

*Information – DSH Redistribution State Plan Amendments (SPA)*, June 21, 2011 available at https://www.medicaid.gov/Federal-Policy-Guidance/downloads/cmcs_informational_bulletin_dsh.pdf.

40.     CMS regulations finalized in late 2008, which implement the DSH auditing and reporting provisions, 73 Fed. Reg. 77904 (Dec. 19, 2008) ("the 2008 Final Rule"), require DSH auditors to certify six specific verifications related to a state's DSH program. 42 C.F.R. § 455.304(d). Verification 2 is that the "DSH payments made to each qualifying hospital comply with the hospital-specific DSH payment limit." 42 C.F.R. § 455.304(d)(2). Verification 3 is that "[o]nly uncompensated care costs of furnishing inpatient and outpatient hospital services to Medicaid eligible individuals . . . for the inpatient and outpatient hospital services they received as described in Section 1923(g)(1)(A) of the Act [42 U.S.C. § 1396r-4(g)(1)(A)] are eligible for inclusion in the calculation of the hospital-specific disproportionate share limit payment limit, as described in Section 1923(g)(1)(A) of the Act." 42 C.F.R. § 455.304(d)(3).

41.     Verification 4 then identifies specifically the payments that must be considered in calculating the hospital-specific DSH limit:

> For purposes of this hospital-specific limit calculation, any *Medicaid payments (including regular Medicaid fee-for-service rate payments supplemental/enhanced Medicaid payments and Medicaid managedcare organization payments*) made to a disproportionate share hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals, which are in excess of the Medicaid incurred costs of such services are applied against the uncompensated care costs of furnishing inpatient hospital and outpatient hospital services to individuals with no source of third party coverage for such services.

42 C.F.R. § 455.304(d)(4) (emphasis added).

42.     A separate section of CMS' regulations requires states to report for purposes of confirming each DSH hospital's hospital-specific DSH limit the hospital's "[t]otal annual uncompensated care costs," defined as follows:

> [T]he total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals and to individuals with no source of third party coverage for the hospital services they receive less the sum of *regular Medicaid [fee-for-service] rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments, uninsured revenues, and Section 1011 payments* for inpatient and outpatient hospital services.

42 C.F.R. § 447.299(c)(16) (emphasis added).

43.     The regulations take pain to define in greater detail each component of a hospital's "[t]otal annual uncompensated care costs," establishing the following formula: "Total annual uncompensated care costs" "equal the sum of paragraphs (c)(9) [Total Medicaid IP/OP Payments], (c)(12) [Uninsured IP/OP revenue], and (c)(13) [Total Applicable Section 1011 Payments] subtracted from the sum of paragraphs (c)(10) [Total Cost of Care for Medicaid IP/OP Services] and (c)(14) [Total cost of IP/OP care for the uninsured] of this section." 42 C.F.R. § 447.299(c)(16).

44.     Neither the definition of "[t]otal annual uncompensated care costs," at 42 C.F.R. § 447.299(c)(16), nor the defined terms in (c)(9), (c)(12), (c)(13), (c)(10), or (c)(14) reference private insurance or Medicare payments.

45.     CMS regulations in effect during the relevant state fiscal years (SFY) 2012 and 2013 are unambiguous in directing states to subtract only Medicaid payments, not Medicare and private insurance payments, from Medicaid costs to calculate uncompensated care for purposes of determining the hospital-specific DSH limit.

46.     The regulatory definition of "Total Cost of Care for Medicaid IP/OP Services" is "[t]he total annual costs incurred by each hospital for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals." Under this definition, the "cost" component of calculating a hospital's uncompensated costs is not net of payments. 42 C.F.R. § 447.299(c)(10).

47.     CMS issued further guidance to independent auditors regarding the calculation of the

hospital-specific DSH limit. General DSH Audit and Reporting Protocol, CMS-2198-F (the "Protocol"). The Protocol states as follows:

> To determine the existence of a Medicaid shortfall, Medicaid IP/OP hospital costs (including Medicaid managed care costs) must be measured against Medicaid IP/OP revenue received for such services in the audited State Plan rate year (including regular Medicaid rate payments, add-ons, supplemental and enhanced payments and Medicaid managed care revenues).

*Id.* at 3.

48.    The Protocol then provides six pages of step-by-step instructions for making an "Uncompensated Care Cost Determination," including detailed sources for data collection. *Id.* at 5-10. The Protocol describes the final calculation as follows:

> 9.    Auditor applies MMIS generated total IP/OP hospital Medicaid FFS payments (other than DSH) to total IP/OP hospital Medicaid FFS cost
>
> 10.    Auditor applies IP/OP hospital Medicaid managed care revenues against IP/OP hospital Medicaid managed care costs
>
> 11.    Auditor applies IP/OP hospital revenues for patients with no source of third party coverage against the costs for IP/OP hospital services provided to such individuals
>
> 12.    Sum of steps 9-11 are summed to determine the total amount of costs eligible for DSH reimbursement and considered the OBRA 1993 hospital specific DSH limit

*Id.* at 10.

49.    The Protocol does not at any point reference private insurance or Medicare payments. *Id.*

50.    The Protocol is unambiguous in directing states to subtract only Medicaid payments, not Medicare and private insurance payments, from Medicaid costs to calculate uncompensated care for purposes of determining the hospital-specific DSH limit.

51.     CMS also issued a template DSH report for states to use in fulfilling their reporting requirements.    DSH    Report    Format    (the    "Report    Format"),    available    at https://www.medicaid.gov/medicaid/financing-and-reimbursement/downloads/ dshreportformat.pdf. The Report Format contains a column for each element in the calculation of the Medicaid shortfall, including "Total Cost of Care – Medicaid IP/OP Services," "Regular IP/OP Medicaid FFS Rate Payments," "IP/OP Medicaid MCO Payments," and "Supplemental Enhanced IP/OP Medicaid Payments." Report Format. The Report Format does not include a line for reporting Medicare or private insurance payments.

### CMS Policy Issued Through FAQ Numbers 33 & 34

52.     In January 2010, CMS posted a document on its website entitled "Additional Information on the DSH Reporting and Audit Requirements," which contained Questions and Answers purporting to provide additional guidance on, among other things, the calculation of the hospital-specific DSH limit.

53.     In response to a question asking whether "days, costs, and revenues associated with patients that have both Medicaid and private insurance coverage . . . [should] be included in the calculation of the . . . DSH limit," FAQ 33 states as follows:

> Days, cost, and revenues associated with patients that are dually eligible for Medicaid and private insurance should be included in the calculation of the Medicaid utilization rate (MIUR) for the purposes of determining a hospital eligible to receive DSH payments. Section 1923(g)(1) does not contain an exclusion for individuals eligible for Medicaid and also enrolled in private health insurance. Therefore, days, costs, and revenues associated with patients that are eligible for Medicaid and also have private insurance should be included in the calculation of the hospital-specific DSH limit.  As Medicaid should be the payer of last resort, hospitals should also offset both Medicaid and third-party revenue associated with the Medicaid eligible day against the costs for that day to determine any uncompensated amount.

CMS, "Additional Information on the DSH Reporting and Audit Requirements" at 18, available

at https://www.medicaid.gov/medicaid/financing-and-reimbursement/down loads/part-1-additional-info-on-dsh-reporting-and-auditing.pdf (last visited March 22, 2017).

54.    In response to a question asking whether "costs for dual eligibles should be included in uncompensated care costs," and "[u]nder what circumstances should we include Medicare payments," FAQ 34 states as follows:

> Section 1923(g) of the Act defines hospital-specific limits on [federal financial participation] for Medicaid DSH payments. Under the hospital-specific limits, a hospital's DSH payment must not exceed the costs incurred by that hospital in furnishing services during the year to Medicaid and uninsured patients less payments received for those patients. There is no exclusion in section 1923(g)(1) for costs for, and payment made, on behalf of individuals dually eligible for Medicare and Medicaid. Hospitals that include dually-eligible days to determine DSH qualification must also include the costs attributable to dual eligibles when calculating the uncompensated costs of serving Medicaid eligible individuals.

> Hospitals must also take into account payment made on behalf of the individual, including all Medicare and Medicaid payments made on behalf of dual eligibles. In calculating the Medicare payment for service, the hospital would have to include the Medicare DSH adjustment and any other Medicare payments (including, but not limited to Medicare IME and GME) with respect to that service. This would include payments for Medicare allowable bad debt attributable to dual eligibles.

55.    By requiring the deduction of private insurance and Medicare payments from Medicaid costs in the calculation of the hospital-specific DSH limit, FAQs 33 and 34 directly conflict with and substantively amend the calculation of the hospital-specific DSH limit in the Medicaid Statute, CMS regulations, the Protocol, and the Report Format described in Paragraphs 30-51 herein.

## **The 2017 Final Rule**

56.    Following the issuance of FAQs 33 and 34 and the ensuing litigation described in Paragraphs 19-25 above, CMS issued a proposed rule in August 2016 seeking to amend the calculation of the Medicaid shortfall in its regulations.

15

57.    CMS published its Final Rule on April 3, 2017 ("the 2017 Final Rule"), which became effective June 2, 2017, redefined the "Total Cost of Care for Medicaid IP/OP Services" at 42 C.F.R. §447.299(c)(10) to specify that:

> For purposes of this section, costs—
> (i) Are defined as costs net of third party payments, including, but not limited to, payments by Medicare and private insurance.

82 Fed. Reg. 16114, 16122 (Apr. 3, 2017).

58.    CMS describes the 2017 Final Rule as a "clarification to existing policy" and an effort to "make[] explicit in the text of the regulation, an existing interpretation." 82 Fed. Reg. at 16114, 16118. Thus, despite its June 2017 effective date, CMS is by its own admission already enforcing the policy in the 2017 Final Rule: "This policy is currently being enforced, applied and implemented uniformly across all states, except in limited instances where we have suspended enforcement of the existing policy in light of court orders." 82 Fed. Reg. at 16119. In other words, CMS is continuing to apply FAQs 33 and 34 for purposes of calculating the hospital-specific DSH limit for years prior to the enactment of the 2017 Final Rule, except in those states where enforcement has been enjoined by court order.

## VI. FACTUAL ALLEGATIONS

59.    Plaintiff hospitals rely heavily on the DSH program to provide vital hospital services to Medicaid and uninsured patients.

60.    As required by statute, 42 U.S.C. § 1396r-4(j), the Mississippi Division of Medicaid (DOM) employed an independent auditor, Myers and Stauffer LC, to audit the state's compliance with the DSH program for state fiscal years (SFY) 2012 and 2013.

61.    In conducting its audit for SFY 2012 and 2013, Myers and Stauffer followed the instructions in FAQs 33 and 34, deducting Medicare and private insurance payments in its calculation of the Medicaid shortfall component of the hospital-specific DSH limit. Private insurance

payments were deducted for Medicaid-eligible patients even when the plaintiff hospitals did not submit a claim for payment to Medicaid.

62.    Based in part on the policies in FAQs 33 and 34, the audit reports for SFY 2012 issued by Myers and Stauffer on November 17, 2015 conclude: that Calhoun received a DSH overpayment for SFY 2012 of $323,041.72; that DRMC received a DSH overpayment for SFY 2012 of $545,999.47; that GLMC received a DSH overpayment for SFY 2012 of $493,539; that MBMC received a DSH overpayment for SFY 2012 of $3,208,337; that St. Dominic's received a DSH overpayment for SFY 2012 of $801,311; and that THS received a DSH overpayment for SFY 2012 of $148,761.21.  (This group of Plaintiffs is referred to as "the FY 2012 Plaintiff Hospitals").  In reliance on the above stated audit conclusions, DOM issued each of those Plaintiff Hospitals a recoupment notice dated January 4, 2016 in the amount of the claimed overpayments.

63.    In accordance with DOM's administrative procedures (§43-13-121, *Miss. Code Ann.*, Miss. Admin. Code Title 23, Part 300), the FY 2012 Plaintiff Hospitals timely filed on February 3, 2016, an appeal with DOM challenging the recoupments and audit calculation of hospital specific DSH limit based on CMS's directives incorporated in FAQs 33 and 34. The administrative DOM appeals together with the underlying Myers and Stauffer audit reports and recoupment notice for the FY 2012 Plaintiff Hospitals are attached as collective Exhibit 2 A-L.

64.    While those administrative appeals were pending, the preliminary injunctions against CMS's enforcement of FAQs 33 and/or 34 were issued in the *Texas Children's* and *New Hampshire Hospital Association* cases. Soon after those injunctions were entered, DOM issued an administrative order on June 9, 2016 staying and clarifying the recoupment and appeal proceedings. This Order confirmed that the Myers and Stauffer audits and calculated DSH overpayments were based on instructions from CMS contained in FAQs 33 and 34 and provided that the recoupment and appeal proceedings are stayed pending conclusion of these Plaintiff Hospitals' administrative

petition to CMS to retract the policies contained in FAQs 33 and 34, including any judicial action concerning the Plaintiff Hospitals' challenge to the inclusion of Medicare and/or private health insurance revenue in the calculation of uncompensated care cost (UCC) and hospital-specific DSH limits. See Orders attached as Exhibit 3.

65.    On June 16, 2016, July 13, 2016, and July 15, 2016, the FY 2012 Plaintiff Hospitals submitted a petition to Andrew Slavitt, then Administrator of CMS, pursuant to the Administrative Procedures Act, 5 U.S.C. §553 *et. seq.* requesting that CMS rescind the application of the policies contained in FAQs 33 and 34 consistent with the judicial injunctions entered in the *Texas Children's* and *New Hampshire Hospital Association* cases. The petitions to CMS on behalf of these Plaintiff Hospitals are attached as Exhibit 4 A-C.

66.    On March 2, 2017, the U.S. District Court for the District of New Hampshire issued an Order in the *New Hampshire Hospital Association* case permanently enjoining the enforcement by CMS of the policies contained in FAQs 33 and 34 because such sub-regulatory directives were contrary to the law established in 42 U.S.C. §1396r-4(g)(1)(A) and 42. C.F.R. §447.299(c)(16), were arbitrary and capricious, were in excess of the Secretary's authority, and constituted invalid substantive rules promulgated without the notice and comment procedures required by the Administrative Procedures Act.

67.    On March 14, 2017, the FY 2012 Plaintiff Hospitals supplemented their administrative petition to CMS requesting that CMS abide by the permanent injunction entered against the enforcement of FAQs 33 and 34. The supplemental petition is attached as Exhibit 5.

68.    Myers and Stauffer also conducted DSH audits for SFY 2013 applying the directives contained in FAQs 33 and 34. On November 21, 2016, Myers and Stauffer issued audit reports that concluded: that BMC-GT received a DSH overpayment for SFY 2013 of $2,070,021.64; that GLMC received a DSH overpayment for SFY 2013 of $744,265.70; that MH-Batesville (formerly Tri-Lakes

Medical Center) received a DSH overpayment for SFY 2013 of $3,298,386.54; and that St. Dominic received a DSH overpayment for SFY 2013 of $231,663.37 (This group of Plaintiffs is referred to as the "FY 2013 Plaintiff Hospitals." GLMC and St. Dominic are in both groups.)

69.    Like the SFY 2012 audits, DOM issued recoupment notices on January 13, 2017, to the FY 2013 Plaintiff Hospitals in the respective amount of the claimed overpayments. On February 9, 2017, and February 10, 2017, the FY 2013 Plaintiff Hospitals filed a timely appeal with DOM raising the same issues concerning the invalidity of the directives of FAQs 33 and 34 as was raised by appeals on the recoupments for SFY 2012. The appeals, audit reports and recoupment notices for SFY 2013 are attached as Exhibit 6 A-E.

70.    Consistent with the Order entered staying the SFY 2012 recoupment and appeal proceedings, a similar administrative Order was entered by DOM staying the SFY 2013 recoupment and appeal proceedings. Exhibit 7. An administrative petition to CMS was submitted on behalf of these plaintiff hospitals that are the subject to recoupments for SFY 2013. Exhibit 8.

71.    CMS never directly responded to, or even acknowledged receipt of, the administrative petitions submitted by the 2012 FY Plaintiff Hospitals. By letter dated June 15, 2017, Seeme Verman, CMS Administrator, notified the 2013 FY Plaintiff Hospitals that their petition was effectively denied through the adoption of the 2017 Final Rule entitled "Medicaid DSH Payments: Treatment of Third Party Payers in calculating Uncompensated Costs (CMS-2399-F)" which required the inclusion of Medicare and private insurance payments in calculating hospital-specific DSH limits. See Exhibit 9. Thus, by issuing the 2017 Final Rule which became effective June 2, 2017, CMS has taken final agency action on the subject of the petition of all Plaintiff Hospitals'.

## VII. THE ADMINISTRATIVE PROCEDURE ACT

72.    A "rule" is defined by the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret,

or prescribe law or policy." 5 U.S.C. § 551(4). "Rule making" is the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

73.     The APA prescribes the procedures federal agencies must follow in promulgating rules. Pursuant to 5 U.S.C. § 553(b), "[g]eneral notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." Where notice is required, an agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." *Id.* § 553(c).

74.     Section 706(2)(A) of the APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

75.     Section 706(2)(C) of the APA requires a reviewing court to "hold unlawful and set aside" agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

76.     Section 706(2)(D) of the APA requires a reviewing court to "hold unlawful and set aside" agency action that is "without observance of procedure required by law."

## VIII.  STATEMENT OF CLAIMS

### COUNT I

**The FAQs Are Unlawful by Virtue of Defendants' Failure to Follow
Legally Required Procedures (Administrative Procedure Act, 5
U.S.C. §§ 553, 706(2)(A), (D))**

77.     Plaintiffs reallege paragraphs 1 through 76 as if set forth in full.

78.     In the 2008 Final Rule, Defendant CMS adopted through notice-and-comment rulemaking duly promulgated regulations implementing the DSH audit and reporting provisions of the Medicaid Statute. 42 U.S.C. § 1396r-4; 42 C.F.R. Parts 447 and 455. These regulations, in effect during all applicable SFYs, are unambiguous. They expressly prescribe the methodology for calculating the Medicaid shortfall component of the hospital-specific DSH limit as follows: "the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals . . . less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments . . . ." 42 C.F.R. § 447.299(c)(16).

79.     Despite these unambiguous regulations, Defendants issued without notice or opportunity for comment the policies in FAQs 33 and 34, which require the inclusion of private insurer and Medicare payments in the calculation of the Medicaid shortfall component of the hospital-specific DSH limit.

80.     The policies in FAQs 33 and 34 amend the unambiguous  substantive language of 42 C.F.R. § 447.299(c)(16) by adding private insurer and Medicare payments to the categories of payments that must be deducted in calculation of the Medicaid shortfall component of the hospital-specific DSH limit.

81.     That CMS since has sought through its 2017 Final Rule to codify the policies in FAQs 33 and 34 underscores the need to implement these policies through formal notice and comment rule making.

82.     The policies in FAQs 33 and 34 constitute "final agency action for which there is no other adequate remedy." 5 U.S.C. § 704.

83.     Defendants are enforcing the policies in FAQs 33 and 34 by, among other things, instructing that Mississippi DOM's independent auditors must deduct Medicare and private insurer

payments in calculating the hospital-specific DSH limit in accordance with FAQs 33 and 34 and requiring DOM to recoup from the plaintiff hospitals sums specified above that were calculated as DSH overpayment based on the erroneous audit instructions.

84.    Section 706(2)(A) of the APA requires a reviewing court to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Section 706(2)(D) of the APA requires a reviewing court to "hold unlawful and set aside" agency action that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

85.    The policies in FAQs 33 and 34 requiring the deduction of private insurance and Medicare payments in the calculation of the Medicaid shortfall component of the hospital-specific DSH limit have the force and effect of law. As such, they are legislative rules that substantively amend the existing federal regulations without following the APA's required notice and comment rule making procedures. *See* 5 U.S.C. §§ 553(b)-(d).

86.    Therefore, the policies in FAQs 33 and 34 are arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitute agency action taken without observance of procedure required by law. Thus, they should be vacated pursuant to 5 U.S.C. § 706(2)(A), (D).

## COUNT II

### The Policies in the FAQs Are Unlawful Because CMS Acted in Excess of Its Statutory Authority
### (Administrative Procedure Act, 5 U.S.C. § 706(2)(C), Medicaid Act, 42 U.S.C. § 1396r-4)

87.    Plaintiff realleges paragraphs 1 through 86 as if set forth in full.

88.    The Medicaid Statute, 42 U.S.C. § 1396r-4(g)(1)(A), sets forth the calculation to be used in determining the Medicaid shortfall component of the hospital- specific DSH limit. It unambiguously provides that only "payments under this subchapter," referring to Medicaid payments, are to be subtracted from Medicaid costs in calculating the Medicaid shortfall.

89.    The policies in FAQs 33 and 34 are directly contrary to the plain language of the Medicaid Statute, requiring non-Medicaid payments from private insurers and Medicare to be subtracted from costs in calculating the hospital-specific DSH limit.

90.    Section 706(2)(C) of the APA requires a reviewing court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority . . . or in short of statutory right." 5 U.S.C. § 706(2)(C).

91.    By unlawfully enforcing the policies in FAQs 33 and 34, including in SFYs 2012, and 2013, the Defendants acted in excess of their statutory jurisdiction and authority under the Medicaid Statute.

92.    The policies in FAQs 33 and 34 are therefore unlawful and should be set aside under 5 U.S.C. § 706(2)(C).

## COUNT III

**The FAQs Are Arbitrary and Capricious and Therefore Unlawful Because They Are Inconsistent with the Plain Language of the 2008 Final Rule (Administrative Procedure Act, 5 U.S.C. § 706(2)(A))**

93.    Plaintiffs reallege paragraphs 1 through 92 as if set forth in full.

94.    The 2008 Final Rule, which was in effect during all applicable SFYs, unambiguously provides the methodology for reporting the Medicaid shortfall component of the hospital-specific DSH limit as follows: "the total cost of care for furnishing inpatient hospital and outpatient hospital services to Medicaid eligible individuals . . . less the sum of regular Medicaid FFS rate payments, Medicaid managed care organization payments, supplemental/enhanced Medicaid payments . . . ." 42 C.F.R. § 447.299(c)(16). The terms "Total Cost of Care for Medicaid IP/OP Services" and "Total Medicaid IP/OP Payments" are explicitly defined in the regulations, and neither term includes payments from private insurers or Medicare. 42 C.F.R. § 447.299(c)(9), (10).

95.    Section 706(2)(A) of the APA requires a reviewing court to "hold unlawful and set

aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

96.     It is arbitrary and capricious for an agency to adopt an interpretation of a regulation that is "plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

97.     The policies in FAQs 33 and 34 are plainly erroneous and inconsistent with the plain language of 42 C.F.R. § 447.299.

98.     Therefore, the policies in FAQs 33 and 34 are arbitrary, capricious, an abuse of discretion, and not in accordance with law and should be vacated pursuant to 5 U.S.C. § 706(2)(A).

## COUNT IV

**The 2017 Final Rule is Unlawful Because CMS Acted in Excess of Its Statutory Authority (Administrative Procedure Act, 5 U.S.C. § 706(2)(C), Medicaid Act, 42 U.S.C. § 1396r-4)**

99.     Plaintiffs reallege paragraphs 1 through 98 as if set forth in full.

100.     The Medicaid Statute, 42 U.S.C. § 1396r-4(g)(1)(A), sets forth the calculation to be used in determining the Medicaid shortfall component of the hospital-specific DSH limit. It unambiguously provides that only "payments under this subchapter," referring to Medicaid payments, are to be subtracted from Medicaid costs in calculating the Medicaid shortfall.

101.     The policies in the Final Rule are directly contrary to the plain language of the Medicaid Statute, requiring non-Medicaid payments from private insurers and Medicare to be subtracted from costs in calculating the hospital-specific DSH limit.

102.     Section 706(2)(C) of the APA requires a reviewing court to "hold unlawful and set aside" agency action "in excess of statutory jurisdiction, authority . . . or in short of statutory right." 5 U.S.C. § 706(2)(C).

103.     In unlawfully promulgating the 2017 Final Rule, the Defendants acted in excess

24

of their statutory jurisdiction and authority, and short of statutory right under the Medicaid Statute.

104.    The 2017 Final Rule is therefore unlawful and should be set aside under 5 U.S.C. §706(2)(C).

## COUNT V

### Alternatively, the 2017 Final Rule Cannot be Applied Retroactively.

105.    Plaintiffs reallege paragraphs 1 through 104 as if set forth in full.

106.    In the unlikely event the Court determines that the 2017 Final Rule is within Defendants' statutory authority, the 2017 Final Rule cannot be applied retroactively to the SFY 2012 and SFY 2013 recoupments at issue in this case.

107.    The 2017 Final Rule is a substantive change to the pre-existing lawfully established methodology, i.e., the 2008 Final Rule, for determining uncompensated care cost, Medicaid shortfall, and/or the hospital-specific DSH limit. As such, it is not merely a "clarification" of the lawfully adopted rules or regulations.

108.    Retroactive rulemaking is "disfavored in the law" and only permissible if there is express Congressional authorization. Here, there is no express Congressional authorization to promulgate a retroactive rule.    Thus, as a substantive rule, the 2017 Final Rule can have only prospective, and not retrospective, application.

109.    Moreover, the prospective application of the 2017 Final Rule cannot support audits of DSH payments for SFY 2012 and/or 2013 that erroneously subtracted Medicare and third party insurance payments to calculate the recoupments sought from the plaintiff hospitals for SFY 2012 and/or 2013.

110.    Thus, in the alternative, Defendants' requirement that states apply the 2017 Final Rule retroactively is unlawful in violation of the APA.

## COUNT V

### Declaratory Relief Pursuant to 28 U.S.C. § 2201

111.    Plaintiff realleges paragraphs 1 through 110 as if set forth in full.

112.    There is a real and actual controversy between Plaintiffs and Defendants regarding whether Defendants may enforce FAQs 33 and 34 and/or the 2017 Final Rule to require the deduction of private insurer and Medicare payments in calculating the Medicaid shortfall component of the hospital-specific DSH limit.

113.    Plaintiff Hospitals stand to lose millions of dollars of DSH funding to which they are statutorily entitled if Defendants are permitted to enforce FAQs 33 and 34 or apply the 2017 Final Rule retroactively. The controversy between Plaintiff and Defendants is thus real and substantial and demands specific relief through a decree of a conclusive character.

114.    Plaintiffs are therefore entitled to declaratory judgment that any attempt by Defendants to apply FAQs 33 or 34 or the 2017 Final Rule retroactively would be unlawful.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court for the following relief:

A.    A declaration that the policies in FAQs 33 and 34 and/or the 2017 Final Rule, that require the deduction of private insurer and Medicare payments in calculating the Medicaid shortfall component of the hospital-specific DSH limit, have been issued without observance of procedure required by law and therefore violate the APA, as being in excess of Defendants' statutory jurisdiction, arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

B.    An injunction prohibiting enforcement of FAQs 33 and 34 and the 2017 Final Rule and requiring Defendants to notify the State of Mississippi

Division of Medicaid (DOM) that the enforcement of the policies in FAQs 33 and 34 and/or the 2017 Final Rule are enjoined, and should not be used by DOM and/or its independent auditors to calculate the hospital specific DSH limit or to pursue any recoupment from the plaintiff hospitals based thereon for SFY 2012 and/or SFY 2013;

C.    In the alternative, a declaration and injunction that prohibits Defendants from applying or enforcing the 2017 Final Rule retroactively and specifying that the 2017 Final Rule cannot be used to support audit findings or recoupments from the Plaintiff Hospitals for SFY 2012 and SFY 2013;

D.    An order vacating the policies in FAQs 33 and 34 and/or the 2017 Final Rule;

E.    An order awarding Plaintiff its reasonable attorneys' fees incurred for bringing this action; and

F.    Such other and further relief as the Court may deem just and proper.
        Respectfully submitted,

        WISE CARTER CHILD & CARAWAY, PLLC


By: _____
        D. COLLIER GRAHAM, JR. (MSB#4944)
        GEORGE H. RITTER, (MSB#5372)
        401 East Capitol Street, Suite 600 (39201)
        P. O. Box 651
        Jackson, MS  3 9 2 0 5
        Phone: (601) 968-5500
        Fax:  (601) 944-7738
        dcg@wisecarter.com
        ghr@wisecarter.com